**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **SCOTT MICHAEL PUTNAM,** | |
| **Plaintiff,** | **No. 13 CV 1587** |
| **v.** | |
| **CAROLYN W. COLVIN, Acting** | **Magistrate Judge Mary M. Rowland** |
| **Commissioner of Social Security,** | |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Scott Michael Putnam filed this action seeking reversal of the final decision of the Commissioner of Social Security (Commissioner) denying his application for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. For the reasons stated below, the Commissioner's decision is affirmed.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

2d 973, 977 (N.D. Ill. 2001).[1] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on June 7, 2010, alleging that he became disabled on September 1, 2005, because of degenerative joint disease and affective/mood disorders. (R. at 18, 47). Plaintiff later amended the onset date to October 17, 2006.[2] (*Id.* at 18, 319). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 18, 47, 83–88). On September 6, 2011, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 18, 1390–439). The ALJ also heard testimony from Laura Rosch, D.O., a medical expert (ME), and Kari Seaver, a vocational expert (VE). (*Id.*).

The ALJ denied Plaintiff's request for benefits on February 2, 2012. (R. at 18–31). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff did not engage in substantial gainful activity from October 17, 2006, the amended onset date, through December 31, 2006, his date last insured (DLI).[3] (*Id.* at 21). At step two, the ALJ found that Plaintiff's vertebrogenic disorder,

---

[2] Plaintiff has filed numerous claims for Social Security disability benefits. (R. at 18). On October 16, 2006, an Administrative Law Judge (ALJ) found Plaintiff "not disabled," and that decision was upheld by the Appeals Council on April 6, 2007. (*Id.* at 18, 50–52). The ALJ's October 16, 2006 decision stands as the Commissioner's final and binding action on the issue of disability through that date. *See Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998).

[3] The ALJ determined that Plaintiff last met the Act's insured status requirements on December 31, 2006. (R. at 20). "In order to be entitled to DIB, an individual must establish that the disability arose while he or she was insured for benefits." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 348 (7th Cir. 2005). Therefore, in order to recover for benefits, Plaintiff must establish that he was disabled between October 17, 2006—the amended onset date—and December 31, 2006—his date last insured. *See Bjornson v. Astrue,* 671 F.3d 640, 641 (7th Cir. 2012) ("only if [plaintiff] was disabled from full-time work by [his last insured] date is [he] eligible for benefits").

residuals from an underlying left knee injury, mild hearing loss, and asthma/chronic obstructive pulmonary disease were severe impairments. (*Id.*). At step three, the ALJ determined that during the relevant time period, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listings enumerated in the regulations. (*Id.* at 23–24).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[4] and determined that during the period of October 17 through December 31, 2005, he could have performed sedentary work as defined in 20 C.F.R. § 404.1567(a) except that Plaintiff must

> avoid concentrated exposure to hazards, dust, and fumes. He must avoid heights and never climb ladders, ropes, and scaffolds. He must be able to use an assistive device. He cannot work in environments with loud background noise. He can only occasionally stoop, bend, kneel, crouch and crawl.

(R. at 24–29). Based on Plaintiff's RFC, the ALJ determined at step four that through his DLI, Plaintiff was unable to perform any past relevant work. (*Id.* at 29). At step five, based on Plaintiff's RFC, his vocational factors, and the VE's testimony, the ALJ determined that through Plaintiff's DLI, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed, including work as a sorter, assembler, and bench packager. (*Id.* at 30). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability from October 17 through December 31, 2006, as defined by the Act. (*Id.*).

---

[4] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

The Appeals Council denied Plaintiff's request for review on November 20, 2012. (R. at 9–12). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail

and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

### A. Evidence Prior to Plaintiff's Alleged Onset Date

On April 16, 2005, Amin Daghestani, M.D., performed a mental disorder examination. (R. at 1106–07). Plaintiff reported that his physical limitations cause anxiety and depression. (*Id.* at 1106). On examination, Plaintiff's affect and mood were depressed, and his insight limited. (*Id.*). Dr. Daghestani diagnosed depressive disorder secondary to medical condition and assigned a Global Assessment of Functioning (GAF) score of 50.[5]

---

[5] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic*

On August 1, 2005, Plaintiff reported depression from the physical problems that restrict his mobility. (R. at 1177). He also reported hostility, lack of motivation, and sleep deprivation. (*Id.* at 1178). On August 22, 2005, a VA medical center physician opined that Plaintiff has difficulty with memory and concentration. (*Id.* at 1047). Plaintiff was diagnosed with adjustment disorder, mixed anxiety/depression, and depressive disorder NOS, and assigned a GAF score of 39.[6] (*Id.* at 1183).

On September 7, 2005, Plaintiff treated with David Eisenberger, Ph.D. (R. at 1173–76). Plaintiff reported a depressed mood nearly every day and tearfulness. (*Id.* at 1173). Dr. Eisenberger opined that Plaintiff was "somewhat depressed" due to his physical limitations. (*Id.* at 1174). He diagnosed possible adjustment disorder with depressed mood and assigned a GAF score of 55.[7] (*Id.* at 1174–75).

---

*and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000) (hereinafter *DSM-IV*). A GAF score of 41–50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *DSM-IV* at 34. The Court notes that the fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013); *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (recognizing that the American Psychiatric Association abandoned the GAF scale after 2012).

[6] A GAF score of 31–40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *DSM–IV* at 34.

[7] A GAF score of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM–IV* at 34.

## B. Evidence After Plaintiff's DLI

On August 11, 2008, Plaintiff presented to Mohamed S. Hassan, M.D., complaining of mild depression over the past several years. (R. at 1008). Dr. Hassan diagnosed possible generalized anxiety disorder and assigned a GAF score of 47. (*Id.*). On August 15, 2008, Plaintiff reported symptoms of anxiety and depression. (*Id.* at 1002).

On November 14, 2009, Dr. Daghestani performed a mental status examination. (R. at 1109–10). Plaintiff was anxious, with a depressed mood and affect, limited insight, and impaired memory. (*Id.* at 1109). Dr. Dagestani diagnosed chronic major depressive disorder due to his physical problems and assigned a GAF score of 58. (*Id.* at 1109–10).

On April 14, 2010, Lisa Polsby, M.D., Plaintiff's psychiatrist at the VA clinic, diagnosed depressive disorder NOS, possible generalized anxiety disorder, and assigned a GAF score of 49. (*Id.* at 940). Dr. Polsby discontinued citalopram, BuSpar, and Klonopin, and started Plaintiff on Seroquel. (*Id.* at 936). On April 29, 2010, Plaintiff reported that he was feeling better and less anxious with a stable mood on his new medications. (*Id.*)

On July 29, 2010, Dr. Polsby completed a Medical Assessment of Ability to do Work-Related Activities. (R. at 861–65). Dr. Polsby identified Plaintiff's symptoms, including poor memory, sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, anhedonia, difficulty thinking or concentrating, suicidal ideation, oddities of thought, social isolation, inappropriate affect, decreased energy,

somatization, and hostility. (*Id.* at 861). Dr. Polsby stated that Plaintiff consistently presents with a depressed mood and a flat affect. (*Id.* at 862). Plaintiff has periodic episodes of suicidal ideation and panic attacks. (*Id.*). Dr. Polsby diagnosed depression NOS and assigned a GAF score of 45–49. (*Id.* at 861). She opined that Plaintiff is extremely limited in his ability to work in coordination with or proximity to others without being unduly distracted and to get along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes. (*Id.* at 863–64). Plaintiff is markedly limited in his ability to maintain attention and concentration for extended periods, complete a normal workday or workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, travel in unfamiliar places, and use public transportation. (*Id.*). Dr. Polsby also found that Plaintiff is moderately limited in his ability to remember locations and work-like procedures, understand, remember and carry out detailed instructions, deal with stress of semi-skilled and skilled work, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in a routine work setting, be aware of normal hazards and take appropriate precautions, and set realistic goals or make plans independently of others. (*Id.*). She concluded that Plaintiff has marked difficulties in maintaining social functioning, constant deficiencies of concentration, persistence or pace, repeated episodes of decompensation, and would likely be absent from work more than three times a month. (*Id.* at 862, 864–65).

On October 21, 2010, Glen Pittman, M.D., a nonexamining DDS physician, completed a Psychiatric Review Technique form. (R. at 885–98). He concluded that there was insufficient evidence in the record to determine whether Plaintiff had any mental functional limitations prior to his DLI. (*Id.* at 897).

Plaintiff began treating with Donald Koziol, M.D., in November 2010. (R. at 1021). On November 16, 2010, Plaintiff was alert, without any signs of drowsiness or sedation. (*Id.* at 916). Dr. Koziol noted that Plaintiff had no adverse side effects, either reported or observed, from the low dosage of Seroquel he was prescribed. (*Id.*). On December 20, 2010, Plaintiff reported feeling "really good." On examination, Dr. Koziol found stable mood, without depression or anxiety, no movement disorder, and no psychotic signs. (*Id.* at 914). He concluded that Plaintiff's history of anxiety symptoms and panic attacks were resolved with the low dose Seroquel prescribed, without any adverse side effects. (*Id.* at 913). Dr. Koziol diagnosed generalized anxiety disorder and continued Seroquel 25mg. (*Id.* at 914).

On May 24, 2011, Dr. Koziol completed a mental RFC questionnaire. (R. at 1021–25). He diagnosed panic disorder and depressive disorder and assigned a GAF score of 49. (*Id.* at 1021). Dr. Koziol described Plaintiff's symptoms as anhedonia, past suicidal ideations, mood disturbance, difficulty thinking or concentrating, and short term memory impairment. (*Id.* at 1022). He opined that Plaintiff would be unable to meet competitive work standards due to his long standing problems with anxiety and depression and would likely be absent from work more than four days per month. (*Id.* at 1023–25).

At the September 6, 2011 hearing, Plaintiff testified that his anxiety and depression prevented him from working. (R. at 1425). He has poor concentration, and suffers from panic attacks and crying spells. (*Id.* at 1412–15). The ME testified that there was insufficient chronological evidence in the record to establish any mental limitations for a 12-month period during the relevant time frame. (*Id.* at 1433–34).

## V. DISCUSSION

Plaintiff raises three arguments in support of his request for a reversal and remand: (1) the ALJ's determination at step three was erroneous; (2) the ALJ's step two determination failed to account for Plaintiff's continuing and progressive mental limitations; and (3) the ALJ's RFC determination was erroneous. (Mot. 1, 6–11). The Court addresses each argument in turn.

### A. Substantial Evidence Supports the ALJ's Conclusion That Plaintiff Failed To Meet the Criteria for Listings 1.02, 1.03, 1.04, 2.08 or 3.03

At step three, the ALJ determined that during the relevant time period, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listings enumerated in the regulations. (R. at 23–24). Specifically, the ALJ concluded:

> With regard to the musculoskeletal listings, [Plaintiff] did undergo left knee surgeries, and there is evidence of degenerative disc disease, but during the period at issue herein and since, [Plaintiff] has been able to ambulate effectively, albeit with an assistive device at times.

> With regard to asthma/COPD, [Plaintiff] has never had emergency room or impatient care for this condition.

> With regard to section 2.08, [Plaintiff's] mild hearing loss was remedied with hearing aids.

(*Id.*). Plaintiff challenges the validity of the ALJ's determination, arguing that the ALJ's determination was perfunctory and failed to refer to any record support whatsoever. (Mot. 9). The Court disagrees.

Although the ALJ's step three determination was limited to a few short paragraphs, the ALJ provided a discussion of Plaintiff's severe and nonsevere impairments, the objective medical evidence, and Plaintiff's credibility directly after step three when the ALJ determined Plaintiff's RFC. The ALJ also gave substantial weight to the opinion of the ME who, after reviewing the medical file, concluded that Plaintiff's impairments failed to meet any of the Listings. (R. at 23, 28–29, 1432). "This discussion provides the necessary detail to review the ALJ's step 3 determination in a meaningful way. We do not discount it simply because it appears elsewhere in the decision. To require the ALJ to repeat such a discussion throughout his decision would be redundant." *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015).

Plaintiff has failed to meet his burden to demonstrate that his impairments satisfy all the requirements of Listing 1.02, 1.03, or 1.04. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (The claimant "has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing."); *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) (The "claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a listing."). The medical evidence supports the ALJ's determination. Listing 1.02, *Major Dysfunction of a Joint*,

Listing 1.03, *Reconstructive Surgery*, and Listing 1.04, *Disorders of the Spine*, all require the inability to ambulate effectively. 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02–1.04. The regulations define "inability to ambulate effectively" as "an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* § 1.00(B)(2)(b)(1). Thus, ineffective ambulation means "having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* (citation omitted).

While the ALJ accommodated Plaintiff's exertional limitations by including the use of an assistive device in his RFC (R. at 24), Plaintiff has not demonstrated an inability to ambulate effectively as contemplated by the regulations. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00(J)(4) ("The medical basis for the use of any assistive device (e.g., instability, weakness) should be documented."). Indeed, the medical evidence cited by the ALJ indicates otherwise. (R. at 21–27; *see, e.g., id.* at 522 (Plaintiff walking daily on a treadmill), 530 (Plaintiff walking daily; knee pain controlled with medications), 537 (Plaintiff walking and swimming regularly), 706 (Plaintiff using cane only when it rains; walking regularly and playing golf), 1145 (Plaintiff reports knee doing "pretty good"; walking regularly on treadmill)).

Similarly, Plaintiff has failed to meet his burden to demonstrate that his impairments satisfy all the requirements of Listing 2.08, *Hearing Loss*. "Listing 2.08 requires a profound hearing impairment, which is not restorable by a hearing aid."

*Ghys v. Comm'r of Soc. Sec.*, No. 09 CV 4034, 2010 WL 1996375, at *8 (C.D. Ill. May 19, 2010).[8] The first mention in the record of any hearing loss is on November 6, 2007, almost a year after Plaintiff's DLI. (R. at 22 (citing *id.* at 748)). Moreover, the audiology testing in January 2008 demonstrated that Plaintiff has only a mild hearing loss, far less than required by Listing 2.08. (*Id.* at 22; *see id.* at 742, 913).

Nor does Plaintiff meet all of the requirements of Listing 3.03. Listing 3.03, *Asthma*, requires evidence of emergency room or impatient hospital care. 20 C.F.R. pt. 404, subpt. P, app. 1 § 3.03. Plaintiff has provided no medical evidence to contradict the ALJ's conclusion that Plaintiff "has never had emergency room or inpatient care for this condition." (R. at 24). Indeed, the ALJ found that Plaintiff did not undergo any pulmonary function testing prior to 2008, when a pulmonary test indicated only a mild defect that responded to medication. (*Id.* at 21–22; *see id.* at 951, 977, 1004).

In sum, Plaintiff has not met his burden of demonstrating that he meets all of the criteria for Listings 1.02, 1.03, 1.04, 2.08, or 3.03. *See Ribaudo*, 458 F.3d at 583. The ALJ's step three determination is supported by substantial evidence.

## B. Substantial Evidence Supports the ALJ's Determination that Plaintiff Could Have Performed a Limited Range of Sedentary Work

The ALJ determined that through Plaintiff's DLI, his vertebrogenic disorder, residuals from an underlying left knee injury, mild hearing loss, and asthma/chronic obstructive pulmonary disease were serious impairments. (R. at 21). After examin-

---

[8] Effective August 2, 2010, Listing 2.08 was removed from the regulations and replaced with Listing 2.10. *Monge v. Astrue*, No. 11 CV 5019, 2014 WL 5025961, at *18 n.19 (S.D.N.Y. Sept. 29, 2014)

ing the medical evidence and giving partial credibility to some of Plaintiff's subjective complaints, the ALJ found that through his DLI, Plaintiff had the RFC to perform sedentary work,[9] except that he must avoid concentrated exposure to hazards, dust, fumes, and heights; can never climb ladders, ropes, and scaffolds; must be able to use an assistive device; cannot work in environments with loud background noise; and can only occasionally stoop, bend, kneel, crouch and crawl. (*Id.* at 24). Plaintiff contends that the ALJ erred in this determination by failing to account for Plaintiff's mental condition.[10] (Mot. 9–11).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); Social Security Ruling (SSR)[11] 96-8p, at *2 ("RFC is an

---

[9] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

[10] Plaintiff also contends that the ALJ failed to include Plaintiff's mental illness and the combination of Plaintiff's impairments in his step two determination. (Mot. 6–8). But "[a]s long as the ALJ determines that the claimant has one severe impairment, the [regulations require the] ALJ [to] proceed to the remaining steps of the evaluation process." *Castile v. Astrue*, 617 F.3d 923, 926–27 (7th Cir. 2010); *see* 20 C.F.R. § 404.1523. "Therefore, the step two determination of severity is merely a threshold requirement." *Castile*, 617 F.3d at 927. Here, the ALJ correctly applied this rule—he found at step two that Plaintiff had four serious impairments and moved on to the remaining steps in the evaluative process. *See Curvin*, 778 F.3d at 648 ("The ALJ correctly applied this rule. He found that Curvin had one severe impairment, *viz.*, the glaucoma in her right eye, and proceeded to the remaining steps in the evaluation process.").

[11] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the

administrative assessment of the extent to which an individual's medically deter-

minable impairment(s), including any related symptoms, such as pain, may cause

physical or mental limitations or restrictions that may affect his or her capacity to

do work-related physical and mental activities."). The RFC is based upon medical

evidence as well as other evidence, such as testimony by the claimant or his friends

and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claim-

ant's RFC, "the ALJ must evaluate all limitations that arise from medically deter-

minable impairments, even those that are not severe," and may not dismiss evi-

dence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; see 20 C.F.R.

§ 404.1545(a)(1) ("We will assess your residual functional capacity based on all rele-

vant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must

include a discussion of why reported symptom-related functional limitations and re-

strictions can or cannot reasonably be accepted as consistent with the medical and

other evidence.").

After carefully examining the record, the Court finds that the ALJ's determina-

tion of Plaintiff's RFC was thorough, thoughtful, and fully grounded in the medical

evidence. There is *no* evidence in the record of *any* mental impairment during the

relevant time period—October 17 through December 31, 2006—that would establish

the presence of work-related mental limitations. Indeed, Plaintiff cites only to three

treatment notes from March to September 2005—more than a year prior to the ear-

---

Court is "not invariably *bound* by an agency's policy statements," the Court "generally de-
fer[s] to an agency's interpretations of the legal regime it is charged with administrating."
*Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

liest possible disability date—along with a treatment note from June 2007—more than 6 months after his DLI—and another note from August 2008—20 months after his DLI. (Mot. 10).

Plaintiff contends that the ALJ failed to consider evidence prior to October 2006—his earliest disability date. (Mot. 6, 10). The ALJ must consider all *relevant* evidence, even that evidence that predates the earliest disability date or postdates the DLI. *See Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010). And here, the ALJ explicitly considered and discussed evidence from 1998 through 2011 to establish a longitudinal understanding of Plaintiff's impairments. (R. at 21–29). But contrary to Plaintiff's argument (Mot. 6–7, 10), because the prior decision dated October 16, 2006, stands as the Commissioner's final and binding action on the issue of disability through that date, the evidence prior to October 17, 2006, cannot be used as part of the "continuous period of not less than twelve months," 20 C.F.R. § 404.1505(a), needed to demonstrate a disabling impairment, *see Groves*, 148 F.3d at 810 (even in the case of a progressive disease, under the collateral estoppel branch of res judicata, the earliest date that a claimant can establish disability following a prior "not disabled" decision is the date following that decision). While the medical evidence prior to October 16, 2006, is certainly relevant and must be considered, Plaintiff must identify medical evidence establishing that his condition deteriorated such that he became disabled *beginning* sometime during the period of October 17 through December 30, 2006. *See Groves*, 148 F.3d at 810 ("although the final judgment denying [claimant's previous] application was res judicata, this did not render

evidence submitted in support of the application inadmissible to establish, though only in combination with later evidence, that she had become disabled after the period covered by the first proceeding."). Because there was *no* relevant evidence during that period, the ALJ evaluated the post-DLI evidence to determine if it could be used to infer whether Plaintiff had any mental work-related limitations that persisted for at least 12 months and that began during the relevant time period. (*See* R. at 22, 25, 28); (*see also id.* at 25) ("The record contains very little medical evidence from the relevant period from October 17 to December 31, 2006, so I must draw inferences from the later medical records and from the testimony of [Plaintiff] and the [ME].").

The ALJ properly rejected the opinions of Drs. Polsby and Koziol. (R. at 28). The opinion of a treating source is entitled to controlling weight only if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *accord Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). Here, the ALJ explicitly considered "the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 404.1527(c)(2), in determining what weight to give the opinions.

On July 29, 2010, Dr. Polsby reported that Plaintiff exhibited a wide variety of symptoms, and she opined that Plaintiff's conditions have imposed marked and ex-

treme functional limitations since July 2005. (*Id.* at 861–65). But Plaintiff did not begin treating with the VA clinic for his mental health issues until February 2009— over two years after his DLI. (*Id.* at 982–83). And Plaintiff's contemporaneous progress notes do not support the level of mental incapacity opined by Dr. Polsby. (*See, e.g., id.* at 936 (Plaintiff's mental condition stable and he reported "feeling better, less anxious" in April 2010 and again in May 2010 after switching to low dosage Seroquel), 916 (no adverse side effects reported or observed in November 2010 from Plaintiff's low dose medication; Plaintiff was alert, with no signs of drowsiness, sedation, or movement disorder), 913–14 (in December 2010, Plaintiff had a stable mood without any depression or anxiety; treating psychiatrist opined that Plaintiff's anxiety symptoms and panic disorder were "resolved" with low dosage Seroquel (quetiapine) and without any adverse side effects; Plaintiff sleeping well with no appetite issues, stating that he feels "really good")). Similarly, the ALJ properly rejected the opinion of Dr. Koziol (R. at 28), who in May 2011 opined that Plaintiff would likely miss four days of work per month (*id.* at 1025). But as discussed above, the progress notes from Dr. Koziol's visits with Plaintiff beginning in November 2010 were unremarkable. (*Id.* at 913–14, 916, 1025).

The ALJ gave great weight to the opinions of the ME, who reviewed the medical record and evaluated the hearing testimony. (R. at 28). Plaintiff does not contest the weight given to the ME's opinions. (Mot. 9–11). The ME testified that there was insufficient chronological evidence in the record to establish any mental limitations for a 12-month period beginning anytime between October 16 and December 31,

2006. (R. at 1433–34). Similarly, the nonexamining DDS physician concluded that there was insufficient evidence in the record to determine whether Plaintiff had any mental functional limitations prior to his DLI. (*Id.* at 897; *accord id.* at 29).

Plaintiff contends that the ALJ failed to discuss evidence that contradicted his conclusions. (Mot. 10). "In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano*, 556 F.3d at 563. Plaintiff cites to three records prior to his onset date as evidence of his mental impairments. (Mot. 10). But as discussed above, these records cannot be used as part of the "continuous period of not less than twelve months," needed to demonstrate a disabling impairment. 20 C.F.R. § 404.1505(a). Instead, Plaintiff must identify medical evidence establishing that he was disabled *beginning* sometime during the period of October 17 through December 30, 2006. *See Groves*, 148 F.3d at 810.

Plaintiff also cites June 2007 and August 2008 treatment notes, arguing that they demonstrate significant mental impairments. (Mot. 10). On June 20, 2007, Plaintiff reported being stressed over his financial situation and feeling nervous when he shops. (R. at 1143). A staff psychiatrist diagnosed severe anxiety. (*Id.* at 1144). On August 14, 2008, Plaintiff described anxiety and depressive symptoms; he was worried about financial and family issues. (*Id.* at 1001–02). He reported feeling anxious, sweating, and shortness of breath when he is in public. (*Id.* at 1002). Plaintiff's treating physician diagnosed depressive disorder NOS. (*Id.* at 1006). But these

treatment notes occurred over six months after Plaintiff's DLI and do not imply that the symptoms began during the critical time period of October 17 through December 31, 2006. Moreover, Plaintiff has not identified any other medical evidence to establish that these mental limitations, even if disabling, continued for at least 12 months. Thus, as the ALJ properly concluded, "[u]ntil quite recently, [Plaintiff] had sporadic treatment at best for depression and anxiety, and the evidence does not reflect mental work-related limitations that persisted for 12 continuous months during the relevant period at issue in this case." That Plaintiff may *now* have significant mental limitations does not undermine the ALJ's conclusion that during the period of October 17 through December 31, 2006, he did not. Substantial evidence supports the ALJ's determination that during this period, Plaintiff could have performed a limited range of sedentary work.

## V. CONCLUSION

For the reasons stated above Plaintiff's Motion to Reverse the Final Decision of the Acting Commissioner of Social Security [26] is **DENIED**, and Defendant's Motion for Summary Judgment [31] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision is affirmed.

E N T E R:

Dated: April 22, 2015

_____
MARY M. ROWLAND
United States Magistrate Judge